42 A.3d 892 (2012)
425 N.J. Super. 600
David SCHMIDT, Plaintiff-Appellant,
v.
CELGENE CORPORATION, Defendant-Respondent, and
CVS/Caremark Corporation, Defendant.
Docket No. A-2685-10T2
Superior Court of New Jersey, Appellate Division.
Argued September 19, 2011.
Decided May 9, 2012.
*893 Neil Mullin, argued the cause for appellant (Smith Mullin, P.C., attorneys; Mr. Mullin, of counsel and on the brief; James E. Burden, on the brief).
James P. Flynn argued the cause for respondent (Epstein Becker & Green, P.C., attorneys; Carmine A. Iannaccone, of counsel and on the brief; Daniel R. Levy, Newark, on the brief).
Before Judges PARRILLO, GRALL and SKILLMAN.
The opinion of the court was delivered by
GRALL, J.A.D.
Plaintiff David Schmidt appeals from the dismissal of a complaint charging his employer, Celgene Corporation, and one of Celgene's customers, CVS/Caremark Corporation (Caremark), with violations of the Conscientious Employee Protection Act (CEPA), N.J.S.A. 34:19-1 to -14. Schmidt filed the complaint well beyond CEPA's one-year limitation period, N.J.S.A. 34:19-5, while he had a breach of contract action based on the same facts pending in Texas. Primarily because Schmidt's delay is attributable to his initial selection of the Texas forum and his subsequent decision to pursue a remedy for a CEPA violation in New Jersey after an unfavorable choice of law determination by a court in Texas, we conclude that the doctrines of substantial compliance and equitable tolling do not permit him to proceed in New Jersey. Accordingly, we affirm.
Schmidt is a resident of Texas, and Celgene is a Delaware corporation with headquarters in New Jersey and no offices in Texas. In 1997, Celgene hired Schmidt as an immunology specialist. Thereafter, Celgene promoted Schmidt several times. He was made manager of sales operations in 1999, business manager for Celgene's southwest unit in 2000, corporate account manager in 2003 and national account manager in 2005. Schmidt has worked and lived in Texas since 2000, but his supervisors during that period were in New Jersey.
As a national account manager, Schmidt dealt with distributors of pharmaceuticals, including Caremark. Among other drugs, Caremark distributed one developed by Celgene and approved by the Federal Drug Administration (FDA) for certain cancer patients. The FDA's approval required reports on adverse reactions, and Celgene needed the cooperation of distributors who received such reports. By federal regulation, distributors were required to report an adverse reaction to Celgene within five days, and Celgene was to file with the FDA within fifteen days of the distributor learning about the incident. Celgene expected Caremark to convey the information more promptly, within twenty-four hours. Caremark was noncompliant.
Celgene's senior manager of drug safety compliance alerted Schmidt and his supervisor to Caremark's delayed reports. From September 2006 through January 2007, Celgene filed one report received from Caremark beyond the FDA's fifteen-day deadline because Caremark transmitted the information after that deadline. Additionally, Caremark had given Celgene late notice more than thirty other times, but Celgene was able to file those reports on time. After receiving the information from the drug safety compliance manager, Schmidt's supervisor directed him to stay on top of Caremark.
Schmidt asserts that he followed that direction by acting to ensure further compliance and that his supervisor retaliated against him for doing so. He explains that Celgene made it clear that adverse-event reporting was a priority for every Celgene *894 employee by requiring them to take online tutorials and score one hundred percent. In addition, Celgene's employee handbook states that all employees must conduct business in a lawful manner and inform his or her supervisor about failures to adhere to the law. That handbook also assures employees that Celgene will not retaliate against an employee who follows that mandate.
In May 2007, Caremark complained about Schmidt to his supervisor, and the supervisor relieved Schmidt of responsibility for Caremark's account. The following month, Schmidt's supervisor summoned him to New Jersey for a meeting on his performance. During that meeting, Schmidt came to believe that the real purpose was to encourage his resignation. A second meeting was scheduled in October 2007, but on the morning of that meeting, Schmidt notified his supervisor that he needed more time to think and would not attend. Later that month, Schmidt's supervisor wrote Schmidt, detailing his shortcomings. He recounted complaints received from account holders and other Celgene employees. Two of Caremark's senior officers described Schmidt as aggressive, negative, argumentative, and they noted that Schmidt failed to communicate about anything other than his complaints. Representatives of two other account holders complained about Schmidt's inaccessibility, and one of them asked for a different manager for its account. A regional sales director for Celgene reported that three-quarters of his managers objected to working with Schmidt. And, the supervisor informed Schmidt that his giving late notice of his decision to miss a meeting "bordered on insubordination."
On December 20, 2007, Schmidt was relieved of all duties and responsibilities. Thereafter, Schmidt retained his title, salary and benefits but received no cash bonuses or stock options. On May 14, 2008, employees of Celgene's human resources section met with Schmidt at an airport in Texas and advised him that he was laid-off as part of a reduction in force. According to Celgene's records, Schmidt was terminated effective June 30, 2008.
During the May 14, 2008 meeting, Schmidt delivered a copy of a complaint he filed with a Texas district court that day. In that complaint, Schmidt named Celgene, Caremark and individual employees of both corporations as defendants. He charged Celgene, but not Caremark, with violation of CEPA and breach of contract and his supervisor and Celgene with slander and disparagement. He charged Caremark and two of its employees with slander and disparagement and interference with his employment relationship.
Celgene filed its answer to the Texas complaint on June 9, 2008 and included two "special exceptions." Pertinent here, Celgene asserted that under Texas choice of law principles, Texas law, not New Jersey law, applied.[1] Celgene moved for an order granting its choice of law exception on February 13, 2009, and the Texas court denied it on May 26, 2009. Celgene moved for reconsideration on June 11, and on November 17, the Texas court reversed itself and granted Celgene's special exception. The order states: "Texas law applies to Plaintiff's claims against Celgene; New Jersey CEPA law is not applicable to the claims made by Plaintiff against Celgene."
On March 2, 2010, the Texas court entered an "agreed order." It states that *895 Schmidt's claims against Celgene "shall be decided according to Texas law" and "shall not be decided under New Jersey law." The order further directs Schmidt to file an amended pleading within twenty days. Schmidt complied and filed an amended complaint excluding the CEPA count on March 22, 2010. It includes an allegation of breach of contract through retaliation for "his stand on the Caremark ... reporting issue and Celgene's apparent failure to comply with its own policies and with FDA mandated reporting criteria" contrary to Celgene's employee handbook.
Schmidt did not seek interlocutory review of the Texas court's order on choice of law. At that time, Section 51.014(d) of the Texas Civil Practice and Remedies Code provided for interlocutory appeal of an order on the parties' agreement that it involved "a controlling question of law as to which there is substantial ground for difference of opinion" and that "an immediate appeal ... may materially advance the ultimate termination of the litigation."[2]See, e.g., Enter. Prods. Partners v. Mitchell, 340 S.W.3d 476, 479 (Tex.App.2011) (reviewing a choice of law determination pursuant to Section 51.014(d)). Nor did Schmidt seek review under Texas mandamus procedure, which is available to address clear legal error in certain circumstances including those in which correction of the error will spare the parties and the public the expense entailed in reversal of proceedings conducted on improper grounds. In re Prudential Ins. Co. of Am., 148 S.W.3d 124, 135-36 (Tex.2004).
Texas appellate courts, like ours, review choice of law determinations de novo under "the principles enunciated in the Restatement (Second) of Conflict of Laws (1971)." Minn. Mining & Mfg. Co. v. Nishika Ltd., 955 S.W.2d 853, 856 (Tex. 1996); see Bondi v. Citigroup, Inc., 423 N.J.Super. 377, 418, 32 A.3d 1158 (App. Div.2011). Like New Jersey, Texas follows the principles of the Restatement (Second) of Conflict of Laws §§ 6, 145, 187-88 (1971), and applies the most significant relationship test in tort and contract cases, unless the agreement underlying a contractual dispute includes a choice of law provision, in which case the courts follow the parties' choice so long as there is a substantial relationship between the state selected and the contract. See P.V. v. Camp Jaycee, 197 N.J. 132, 135-36, 962 A.2d 453 (2008) (abandoning governmental interest analysis in tort cases); Instructional Sys., Inc. v. Computer Curriculum Corp., 130 N.J. 324, 341-42, 614 A.2d 124 (1992) (contract with choice of law provision); State Farm Mut. Auto. Ins. Co. v. Estate of Simmons, 84 N.J. 28, 37, 417 A.2d 488 (1980) (contract); Sonat Exploration Co. v. Cudd Pressure Control, Inc., 271 S.W.3d 228, 231 (Tex.2008) (noting that Texas courts "look to ... section 187 for contracts that contain an express choice of law, and section 188 for those that do not"); Hughes Wood Prods., Inc. v. Wagner, 18 S.W.3d 202, 205 (Tex.2000) (applying §§ 6, 145 and 184 of the Restatement in a case involving a work-related injury); Gutierrez v. Collins, 583 S.W.2d 312, 318-19 (Tex.1979) (tort); cf. D'Agostino v. Johnson & Johnson, 133 N.J. 516, 628 A.2d 305 (1993) (applying the governmental interest analysis in a wrongful discharge which was formerly used in tort cases). If the foregoing choice of law principles dictate application of another state's law, Texas courts decline to enforce that law only if it "appear[s] that it is against good morals or natural justice, or that *896 for some other such reason the enforcement of it would be prejudicial to the general interests of [Texas] citizens." California v. Copus, 158 Tex. 196, 309 S.W.2d 227, 232, cert. denied, 356 U.S. 967, 78 S.Ct. 1006, 2 L.Ed.2d 1074 (1958); see, e.g., Larchmont Farms v. Parra, 941 S.W.2d 93, 95 (Tex.1997) (reversing a decision declining to enforce a provision of New Jersey's Workers' Compensation Law as contrary to public policy in a case in which New Jersey had the most significant interest).
Texas law includes actions based on retaliation against employees. The Supreme Court of Texas has recognized an action for wrongful discharge for an employee who can establish termination based solely on the employee's refusal to participate in illegal conduct. Sabine Pilot Serv., Inc. v. Hauck, 687 S.W.2d 733, 735 (Tex.1985). More recently, the Texas Court considered a case in which an employee was terminated for whistleblowing six months after reporting what he thought might be a violation of Texas law to upper-level management. Winters v. Houston Chronicle Pub. Co., 795 S.W.2d 723, 723-25 (Tex. 1990). In affirming summary judgment for the employer, the Court explained that it was not recognizing a cause of action covering whistleblowers at "this time" and on "these facts." Id. at 725. The Court pointed to numerous whistleblower statutes the Texas Legislature had adopted covering specific fields of endeavor, and its prior decisions declining to impute a generalized obligation of good faith and fair dealing in employment contracts out of concern that such a rule would have the effect of requiring "good cause" for adverse employment actions for "at-will" employees. Id. at 724-25 n. 1, 2.
Two months after Schmidt amended his Texas complaint to exclude the CEPA count and to rely upon an allegation that Celgene breached the promise not to retaliate made in its handbook, Schmidt commenced this litigation in New Jersey. On May 14, 2010, 178 days after the initial Texas order declaring the applicability of Texas law and seventy-three days after the subsequent confirming order, Schmidt filed a New Jersey complaint charging not only Celgene, but also Caremark, with a violation of CEPA based on Celgene's retaliation and Caremark's participation in it. Schmidt's Texas case was still proceeding when the New Jersey trial court granted defendants' motions to dismiss that are the subject of this appeal and denied Schmidt's motion for reconsideration. In fact, the Texas action was still pending in the Texas trial court when this appeal was argued.
After we heard argument, the Texas action was finalized. On October 24, 2011, the Texas court accepted Schmidt's notice of nonsuit on his amended complaint and granted Schmidt's motion to dismiss the amended Texas complaint without prejudice. That order states that Schmidt's request for that relief was made fewer than thirty days before the scheduled trial date and while a motion for summary judgment filed by defendants in the Texas action was pending decision.[3]
Under Texas law, the nonsuit did not extinguish the choice of law determination. In Texas, "plaintiffs have the right to take a nonsuit at any time until they introduce all evidence other than rebuttal evidence." Hyundai Motor Co. v. Alvarado, 892 S.W.2d 853, 854 (Tex.1995). The "nonsuit may have the effect of vitiating earlier interlocutory orders.... A decision on the merits, such as a summary judgment, however, is not vitiated. This includes partial summary judgments." Id. *897 at 854-55 (citations omitted); accord Epps v. Fowler, 351 S.W.3d 862, 868 n. 7 (Tex. 2011) (noting that "when a claimant nonsuits after an unfavorable partial summary judgment, the nonsuit is with prejudice as to the claims disposed of by the judgment"). Texas courts give the same preclusive effect to a venue determination made prior to a nonsuit. In re Team Rocket, L.P., 256 S.W.3d 257, 260 (Tex. 2008). In Team Rocket, the Court explained that these rules are "rooted in the long-standing and fundamental judicial doctrines of res judicata and collateral estoppel, which `promote judicial efficiency, protect parties from multiple lawsuits, and prevent inconsistent judgments by precluding the relitigation' of matters that have already been decided or could have been litigated in a prior suit." Ibid. (quoting Sysco Food Servs., Inc. v. Trapnell, 890 S.W.2d 796, 801 (Tex.1994)).
With this background, we turn to consider the merits. Although the trial court dismissed Schmidt's New Jersey CEPA complaint on several alternative bases, Schmidt's ability to proceed on a CEPA claim filed after the limitation period is the threshold consideration. If he could not proceed on the CEPA claim when the complaint was filed, then there is no reason to consider whether principles of comity or claim and issue preclusion also bar the action.
CEPA provides that "[u]pon a violation of any of the provisions of this act, an aggrieved employee or former employee may, within one year, institute a civil action in a court of competent jurisdiction." N.J.S.A. 34:19-5. The parties have argued this case on the assumption that CEPA's one-year limitation period commenced on May 14, 2008, which they refer to as the date he was fired.[4] Based on that date, a timely complaint should have been filed no later than May 14, 2009. Alderiso v. Med. Ctr. of Ocean County, Inc., 167 N.J. 191, 197-98, 202-03, 770 A.2d 275 (2001). This complaint was filed one year later, on May 14, 2010.
New Jersey recognizes two doctrines that "in appropriate circumstances ... can be relevant" in determining whether the statute of limitation should be tolled based on the filing of a claim against the defendant in another jurisdiction. Negron v. Llarena, 156 N.J. 296, 307, 716 A.2d 1158 (1998). They are equitable tolling and substantial compliance. Ibid. Our courts have applied these doctrines to excuse an untimely filing in New Jersey where the plaintiff has filed a timely claim in a federal court or the court of another state that was dismissed by that court for lack of jurisdiction and followed by a prompt filing in New Jersey. See, e.g., id. at 304-07, 716 A.2d 1158 (dismissal by federal court for lack of diversity jurisdiction, and New Jersey complaint filed within three months of dismissal but four years beyond the limitation period); Galligan v. Westfield Ctr. Serv., Inc., 82 N.J. 188, 190-91, 412 A.2d 122 (1980) (dismissal by federal court for lack of diversity and New Jersey complaint filed two days prior to the dismissal but twenty-two days beyond the limitation period); Berke v. Buckley Broad. Corp., 359 N.J.Super. 587, 600-01, 821 A.2d 118 (App.Div.) (dismissal by federal court based upon declination to exercise supplemental jurisdiction, and New Jersey complaint filed two and a half months after dismissal, but eleven months beyond the limitation period), certif. denied, *898 177 N.J. 571, 832 A.2d 322 (2003); Staub v. Eastman Kodak Co., 320 N.J.Super. 34, 56, 726 A.2d 955 (App.Div.) (dismissal by federal court and New Jersey complaint filed one and a half years after dismissal but beyond the limitation period), certif. denied, 161 N.J. 334, 736 A.2d 527 (1999); Mitzner v. W. Ridgelawn Cemetery, Inc., 311 N.J.Super. 233, 234-35, 709 A.2d 825 (App.Div.1998) (dismissal by New York court for lack of jurisdiction and New Jersey complaint filed within a month of the dismissal but beyond the limitation period).
Because Schmidt timely alleged a CEPA violation by Celgene in the Texas action, we turn to consider whether the doctrines of substantial compliance or equitable tolling permit him to proceed with this untimely claim in New Jersey.
The doctrine of substantial compliance is invoked to avoid defeat of valid claims on technical grounds. Negron, supra, 156 N.J. at 305, 716 A.2d 1158. The party seeking relief must demonstrate:
(1) the lack of prejudice to the defending party; (2) a series of steps taken to comply with the statute involved; (3) a general compliance with the purpose of the statute; (4) a reasonable notice of petitioner's claim[;] and (5) a reasonable explanation why there was not a strict compliance with the statute.
[Id. at 305, 716 A.2d 1158 (quoting Bernstein v. Bd. of Trs. of Teachers' Pension & Annuity Fund, 151 N.J.Super. 71, 76-77, 376 A.2d 563 (App.Div.(1977))).]
As the Court more recently observed, this doctrine has generally been applied where "the injured party [is] seeking flexibility" and "core policy considerations about fault and responsibility" tip the balance "in favor of allowing an injured party to have his or her day in court, rather than being met with a closed courthouse door." Sroczynski v. Milek, 197 N.J. 36, 60-61, 961 A.2d 704 (2008).
Equitable tolling is applied to "implement fully the underlying legislative purposes [of the statute of limitations] to avoid the injustice which would result from a literal reading of the general statutory language." Galligan, supra, 82 N.J. at 191, 412 A.2d 122. Application of this doctrine involves the identification and weighing of public and individual interests. Id. at 193, 412 A.2d 122. In the end, equitable tolling preserves "an opportunity to assert [a] claim" that would be defeated by application of a limitation period in a case where it would not serve the Legislature's objectives. Ibid. "Whenever dismissal would not further the Legislature's objectives in prescribing the limitation, the plaintiff should be given an opportunity to assert his claim." Ibid.
There is no question that the purposes of the limitation period are important to both doctrines.[5] Our Supreme Court has *899 recognized that statutory limitation periods serve these purposes: 1) "creat[ing] desirable security and stability in human affairs," id. at 191-92, 412 A.2d 122; 2) encouraging plaintiffs to diligently pursue their claims, id. at 192, 412 A.2d 122; 3) providing defendants a "fair opportunity to defend," ibid.; and 4) promoting the quality and efficiency of justice by preventing litigation of stale claims and conserving judicial resources for timely claims, ibid.
There are fundamental differences between this case and those in which our courts have granted relief from a limitation period based on substantial compliance or equitable tolling related to the filing of an action involving the same claim in another forum. In those cases, the courts in the initial forums dismissed the complaints in their entirety and not based on a determination related to the merits of the claim.[6]See Restatement (Second) of Conflict of Laws, supra, at § 110 cmt. a (noting "a judgment for the defendant is not on the merits if it is based on the court's lack of jurisdiction or of competence over the subject matter of the controversy"). In addition, a state's refusal to entertain a claim on grounds of public policy is not deemed a decision on the merits. See ibid. (noting that a dismissal based on the forum's public policy is not a decision on the merits). In contrast, a determination based on choice of law by a court exercising jurisdiction over the claim is a decision on the merits. See, e.g., Velasquez v. Franz, 123 N.J. 498, 511-12, 589 A.2d 143 (1991); see also Chick Kam Choo v. Exxon Corp., 486 U.S. 140, 146-51, 108 S.Ct. 1684, 1689-92, 100 L.Ed.2d 127, 136-39 (1988) (applying the "relitigation exception" to the Anti-Federal Injunction Act, 28 U.S.C.S. § 2283, which is strictly construed, and affirming an injunction barring relitigation of a choice of law determination made by the Federal District Court for the Southern District of Texas).
In this case, a Texas court, applying the same choice of law rules as applied in this state, determined that Texas law, not that of New Jersey, applies to Schmidt's claim of retaliatory employment action and required Schmidt to amend his complaint to exclude a count based on CEPA. This was a decision on the merits. Cf. Rimkus Consulting Grp., Inc. v. Cammarata, 257 F.R.D. 127, 138 (S.D.Tex.2009) (concluding that Texas and Louisiana choice of law rules differed, thus permitting relitigation of the issue under Texas law).
The distinction between cases dismissed on jurisdictional grounds and this case significantly alters the balance of factors relevant to the propriety of granting relief from CEPA's limitation period based on substantial compliance and equitable tolling. Most obviously, Schmidt, unlike a plaintiff whose claim has been dismissed, *900 was not foreclosed from proceeding in Texas when he filed this action in New Jersey on the same claim. At that time, and through the date of argument on this appeal, his amended complaint on the same claim was still pending in Texas. Consequently, the primary purpose of these equitable doctrinesavoiding a technical defeat of a meritorious claim on which the doors of the courthouse have been shut was not implicated.
The fact that Schmidt's decision to file in New Jersey was based on the Texas court's unfavorable choice of law determination is also material to the propriety of granting him relief under these equitable doctrines. Schmidt's pursuit of concurrent actions on the same claim had consequences beyond the interests of the parties. New Jersey's harmonious relations with Texas were implicated, requiring "special equities" to warrant any interference by our courts with the initially filed Texas action. Sensient Colors Inc. v. Allstate Ins. Co., 193 N.J. 373, 386-90, 939 A.2d 767 (2008).
In addition, the course of litigation Schmidt chose suggests "forum sampling, which [New Jersey courts] and the federal courts disdain." Velasquez, supra, 123 N.J. at 513, 589 A.2d 143. In essence, Schmidt sought to avoid the unfavorable Texas determination by proceeding with his New Jersey CEPA complaint here while continuing to litigate in Texas in the apparent, and in our view not entirely unrealistic, hope of prevailing in Texas either on appeal or by distinguishing this case from Winters on the ground that it involves an allegation of retaliation contrary to Celgene's promise in the employee handbook. 795 S.W.2d at 723-25.
The foregoing considerations significantly alter the impact that relaxation of CEPA's limitation period would have on the purpose of that statute. As noted above, prompt notice, which Celgene had through the Texas complaint, is not the only purpose served by a statute of limitation. Stability, repose, preservation of judicial resources and encouragement of diligent pursuit of valid claims are additional goals furthered by such statutes. In Velasquez, the Court recognized that repetitive litigation of an issue material to a claim in separate forums undermines "public policies favoring stability, limitation on the duration of litigation of a claim, and conservation of judicial resources." 123 N.J. at 514, 589 A.2d 143.
Although Celgene received prompt notice of the CEPA claim and was not prejudiced in that regard, the filing of a second action in New Jersey 178 days after Celgene obtained a favorable choice of law decision prejudiced Celgene's interest in the repose and stability it obtained with respect to liability under New Jersey law. Instead, Celgene had to respond on the same claim under the law of two states in two forums. That outcome is inconsistent both with the legitimate expectations of Celgene and the interest of judicial economy fostered by a statute of limitation. It also is potentially disruptive of New Jersey's harmonious relationship with Texas. See id. at 511-13, 589 A.2d 143 (discussing our disinclination to serve as an appellate court for another jurisdiction). Moreover, Schmidt's delay of nearly six months between the unfavorable choice of law decision and the filing of the New Jersey complaint cannot be viewed as consistent with diligent pursuit of a remedy subject to a one-year limitation period. It is more consistent with an effort to preserve his options while looking for the most favorable forum.
In our view, the differences between this case and those in which the equitable doctrines have been applied require denial of relief under both doctrines. Schmidt's *901 conduct was not generally compliant with the purposes of the statute, and the statute's purposes are served by a denial of relief. Negron, supra, 156 N.J. at 305, 716 A.2d 1158; Galligan, supra, 82 N.J. at 195, 412 A.2d 122. Most important, Schmidt had not been denied a forum to adjudicate his claim of retaliatory discharge.
Because we have concluded that CEPA's time bar applies, we have no reason to address the significant issues of comity and issue preclusion implicated by Schmidt's effort to litigate in two states.
Affirmed.
NOTES
[1] The appendix filed with this appeal does not include Celgene's initial answer, but Celgene included the date of its initial answer in a brief submitted to support its special exception. The special exception is found in Celgene's "second amended answer" filed on November 21, 2008.
[2] Section 51.014(d) has since been amended to permit the trial court, rather than the parties, to determine whether the two conditions are satisfied. Acts 2011, 82nd Leg., ch. 203 (H.B.274), § 3.01 (effective September 1, 2011).
[3] Following argument, Celgene moved to supplement the record, and Schmidt moved to file a sur-reply brief. We now grant those motions.
[4] The record arguably permits assignment of a later termination date, June 30, 2008, but as neither party argues the point and the difference between May 14 and June 30 is inconsequential given the dates of filing in Texas and New Jersey, we follow the parties' arguments and use May 14, 2008 as the accrual date.
[5] There are circumstances in which a specific limitation period the Legislature has assigned to a statutory cause of action not available at common law signifies the Legislature's intention to have that limitation period applied "strictly, inflexibly, and without regard to surrounding circumstances." Negron, supra, 156 N.J. at 318, 716 A.2d 1158 (Handler, J., concurring). Because Celgene has not argued that CEPA's limitation period is of that sort and because we conclude that both doctrines are inapplicable on the facts of this case, we have no reason to resolve that issue. See Villalobos v. Fava, 342 N.J.Super. 38, 45-48, 775 A.2d 700 (App.Div.2001) (declining to reach the issue for the same reason); accord Jones v. Jersey City Med. Cir., 20 F.Supp.2d 770, 773 (D.N.J.1998).

Prior to the adoption of CEPA, the Supreme Court recognized a common law action for wrongful discharge where the termination is contrary to a clear mandate of public policy, Pierce v. Ortho Pharm. Corp., 84 N.J. 58, 72, 417 A.2d 505 (1980); L. 1986, c. 105, § 1, eff. Sept. 5, 1986. CEPA provides an additional and alternative basis for relief. N.J.S.A. 34:19-8. CEPA's legislative history provides no insight on why the Legislature imposed a shorter limitation period for CEPA claims than for tort or contract claims. See Sponsor Statement to S.1105 (1986); Senate Labor, Industry and Professional Committee, Statement to S.1105 (Feb. 24, 1986); Assembly Labor Committee, Statement to S.1105 (May 22, 1986); see also Crusco v. Oakland Care Ctr., Inc., 305 N.J.Super. 605, 611, 702 A.2d 1363 (App.Div.1997) (suggesting a strict construction of limitations the Legislature has imposed on CEPA).
[6] Because these equitable doctrines depend in part on claimant's access to the first forum, we use the term "claim" in the transactional sense in which it is used in the context of issue and claim preclusion. See Restatement (Second) of Judgments, § 24 (defining the term "claim" for purposes of merger, bar and claim "splitting" to include "all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose"); see also R. 4:9-3 (using the transactional approach in the context of the relation-back rule).