8 A.3d 198

PAULA ALEXANDER, JOAN COLL, AND CHERYL THOMPSON-SARD, PLAINTIFFS–APPELLANTS, v. SETON HALL UNIVERSITY, JOHN J. MYERS, ARCHBISHOP OF NEWARK, PRESIDENT OF BOARD OF REGENTS, AND CHAIR OF BOARD OF TRUSTEES, AND INDIVIDUALLY, ROBERT SHEERAN, PRESIDENT AND INDIVIDUALLY, PAULA BULEY, EXECUTIVE VICE PRESIDENT AND INDIVIDUALLY, KAREN E. BOROFF, DEAN OF STILLMAN SCHOOL OF BUSINESS, AND JOSEPH DEPIERRO, DEAN OF COLLEGE OF EDUCATION AND HUMAN SERVICES, DEFENDANTS–RESPONDENTS.

Argued September 13, 2010—Decided November 23, 2010.

220

*Patricia F. Breuninger* argued the cause for appellants (*Breuninger & Fellman,* attorneys; *Ms. Breuninger* and *Kathleen P. Ramalho,* on the briefs).

*Rosemary S. Gousman* argued the cause for respondents (*Fisher & Phillips,* attorneys; *Ms. Gousman* and *David J. Treibman,* on the briefs).

*Richard M. Schall* submitted a brief on behalf of amicus curiae National Employment Lawyers Association of New Jersey (*Schall & Barasch,* attorneys; *Mr. Schall* and *Patricia A. Barasch,* of counsel and on the brief).

Justice LaVECCHIA delivered the opinion of the Court.

In this appeal, we review the timeliness of a wage discrimination complaint, brought under New Jersey's Law Against Discrimination (LAD), *N.J.S.A.* 10:5-1 to -49, which the courts below dismissed based on a statute of limitations application that incorporated the reasoning of *Ledbetter v. Goodyear Tire & Rubber Co.,* 550 *U.S.* 618, 127 *S.Ct.* 2162, 167 *L.Ed.*2d 982 (2007) (establishing framework for analyzing accrual and timeliness in Title VII wage discrimination claims).

Plaintiffs, three female tenured professors at Seton Hall University, filed this 2007 action claiming that they were paid unequal wages in comparison to younger and/or male employees. Their complaint sought damages back to their respective dates of initial hire. The University moved to dismiss based on timeliness grounds. The motion court declared that its analysis would be controlled by the *Ledbetter* decision, and held that any and all disparate wages paid to plaintiffs, including those paid within the two-year period immediately prior to the complaint's filing, were simply the result of allegedly intentional discriminatory pay decisions that occurred outside of the limitations period. The trial court's final order of dismissal was affirmed on appeal. *Alexander v. Seton Hall Univ.,* 410 *N.J.Super.* 574, 586-87, 983 *A.*2d 1128 (App.Div.2009).

We granted plaintiffs' petition for certification, 201 *N.J.* 498, 992 *A.*2d 793 (2010), recognizing that this appeal would afford us the opportunity to address whether New Jersey's LAD jurisprudence would be enhanced by importation of the Supreme Court's *Ledbetter* analysis. We now conclude that there is no necessary or beneficial purpose to be drawn from adoption of the *Ledbetter* approach.

Our holding today reaffirms that in New Jersey the payment of unequal wages on the discriminatory basis of age or sex is proscribed by the LAD, and each payment of such discriminatory wages constitutes an actionable wrong that is remediable under the LAD. The two-year statute of limitations applies to such

violations by merely cutting off the untimely portion of such claims. Thus, the statute of limitations' operation results in limiting the damages recoverable for past discriminatory compensation. Case law in this state has long approached issues concerning the timeliness of LAD actions in wage claims in such a manner, and no persuasive reason has been advanced to supplant that established state law. We hold that plaintiffs' complaint was timely in respect of the allegedly discriminatory wages they received during the two years immediately prior to the filing of their complaint. We therefore reverse and remand for reinstatement of plaintiffs' timely claims of wage discrimination.

## I.

On July 27, 2007, Paula Alexander, Joan Coll, and Cheryl Thompson–Sard, all veteran professors, filed a complaint against their employer, Seton Hall University, and certain school officials (defendants are collectively referred to as "the University"). Plaintiffs alleged LAD violations on the basis of age and gender, specifically, discriminatory discrepancies between their salaries and those earned by younger employees and male employees. As this case was decided below on the basis of a motion to dismiss filed by defendants, we recite the facts in a light most favorable to plaintiffs. *See Fazilat v. Feldstein,* 180 *N.J.* 74, 78, 848 *A.*2d 761 (2004).

The catalyst for plaintiffs' pursuit of this claim was a 2004–2005 annual report ("Report"), compiled by the University, which detailed the salaries of its full-time faculty members by "College," "Gender," "Rank," and "Salary." Although the Report was not generally available to the faculty, plaintiffs obtained a copy in August of 2005. The Report revealed that higher salaries were paid to newer, younger faculty members as compared to those paid to longer-term, older faculty members. A gender-based pattern of disparate compensation was also apparent. The plaintiffs, each over sixty years in age and boasting at least nineteen

years of service to the University, claim that the discrimination permeates several University departments.

Paula Alexander is an Associate Professor in the Stillman School of Business ("Business School"), Management Department. She was hired in 1976, and received tenure in 1981 when she was promoted to Associate Professor. In 2004–2005, Alexander earned $79,000 after twenty-four years of service at the Associate Professorship level. The Report revealed that two female Associate Professors, considerably younger and newer to the University than Alexander, were each earning approximately $50,000 a year more than she was. The following year, the University hired a young male Assistant Professor for the Business School at a salary of $105,000 per annum, as compared to Alexander's $87,000 for that year.

Joan Coll is a Full Professor in the Business School, Management Department. She was hired in 1981, and since 1994 has held the position of Full Professor, the University's highest rank. The 2004–2005 Report revealed that Coll was earning approximately $20,000 a year less than the male Full Professors in the Business School. Upon reviewing the Report, both Alexander and Coll requested an internal adjustment to bring their salaries in line with those of comparable younger professors and male professors. Those requests were denied.

Cheryl Thompson–Sard is an Associate Professor in the College of Education and Human Services, Department of Professional Psychology and Family Therapy. She was hired in 1987 and promoted to the rank of Associate Professor with tenure in 1992. Thompson–Sard's claims are based on averages, calculated from the Report, indicating that male Associate Professors in the College of Education earned approximately $15,000 more per year than their female counterparts.

The matter proceeded on the basis of the University's motion to dismiss for failure to file timely. The trial court framed the issue as whether plaintiffs could bring an action alleging illegal pay discrimination when disparate pay was received during the statute

of limitations period, but was the result of an allegedly intentional discriminatory pay decision that occurred outside the limitations period. To answer that, the trial judge adopted the reasoning in *Ledbetter, supra,* 550 *U.S.* 618, 127 *S.Ct.* 2162, 167 *L.Ed.*2d 982, and dismissed plaintiffs' allegations "that related to wage decisions made prior to July 27, 2005, or the impact of those decisions upon plaintiffs' salaries following July 27, 2005." [1] Plaintiffs' surviving claims therefore were limited, in effect, to the presentation of any fresh discriminatory pay actions, along the lines of the discrete act of the original discriminatory pay-setting decision, that occurred during the two years prior to the filing of the complaint on July 27, 2007.

After unsuccessfully seeking reconsideration, plaintiffs moved to amend the order of May 2, 2008 into a final order dismissing the entire complaint. Plaintiffs represented that because they claimed a "continuing pattern" of discriminatory compensation, all of their claims were impacted by original pay-setting decisions made outside the statute of limitations period. In their motion, plaintiffs certified, "While the wording of the Court's Order of May 2, 2008 appears to dismiss only parts of the Complaint, it effectively dismisses the entire Complaint since nothing remains to be pursued. No discrete acts of discrimination are alleged during the statute of limitations period." On September 26, 2008, the earlier order was amended per the plaintiffs' request, and a final order was entered.

Plaintiffs appealed, framing their argument in terms of the "continuing violation" doctrine common to workplace harassment claims. Because plaintiffs conceded that they had information alerting them to the alleged wage discrimination more than two years before their complaint was filed, they were under the

---

[1] In granting defendants' motion, the trial court judge also declined to apply the discovery rule to plaintiffs' claims. That decision was never appealed and is not before this Court.

impression that their recovery was contingent upon the Appellate Division's adoption of the continuing violation doctrine.

The Appellate Division, however, affirmed the dismissal of the action. *Alexander v. Seton Hall Univ.*, 410 *N.J.Super.* 574, 983 *A.*2d 1128 (App.Div.2009). Influenced by recent federal case law on the subject of wage discrimination claims, specifically the United State Supreme Court's decision in *Ledbetter, supra,* 550 *U.S.* 618, 127 *S.Ct.* 2162, 167 *L.Ed.*2d 982, the panel concluded that the continuing violation doctrine had no applicability in a wage discrimination setting. *Alexander, supra,* 410 *N.J.Super.* at 587, 983 *A.*2d 1128. Rather, citing *Ledbetter,* it held that "a pay-setting decision is a discrete act sufficient to trigger the limitations period." *Id.* at 584, 983 *A.*2d 1128 (internal citations omitted).[2] Consequently, the panel determined that plaintiffs' complaint was untimely because no discriminatory pay-setting decision had occurred during the statute of limitations period. *Id.* at 586–87, 983 *A.*2d 1128 (concluding that receipt of disparate paycheck, without showing discriminatory animus tied to same, is "merely the effect of discriminatory acts that occurred outside the [charging] period and, therefore, did not support a timely cause of action" (internal citation omitted)).

## II.

The issue in this matter concerns the payment of allegedly discriminatory, unequal wages on the basis of gender or age. The University views the LAD violation that has been alleged as one

---

[2] Although the panel debated whether to follow the policy adopted in *Ledbetter,* it concluded that the State Legislature's failure to adopt a post-*Ledbetter* LAD amendment, similar in kind to that codified on the federal level, was indicative of a legislative preference for the federal jurisprudential approach in LAD claims. *Alexander, supra,* 410 *N.J.Super.* at 588, 983 *A.*2d 1128. *See* Lilly Ledbetter Fair Pay Act of 2009, 42 *U.S.C.A.* § 2000e–5(e)(3)(B) (amending Title VII and allowing recovery of back pay for up to two years preceding filing of Title VII charge notwithstanding that original discriminatory compensation decision was made outside time frame for charge's filing).

that, to the extent it arose, accrued as a discrete act of discriminatory animus when the wage was established.

Plaintiffs, on the other hand, argue that through operation of the continuing violation doctrine that has been used in workplace harassment claims, each paycheck that perpetuates a discriminatory wage continues the original LAD violation and sweeps in all prior and current discriminatory, disparate paychecks. Based on that argument, plaintiffs maintain that they are entitled to equitable relief from the two-year statute of limitations.

To address the merits of those divergent views concerning the application of the statute of limitations to a LAD wage discrimination dispute, we start with the statute whose violation is alleged.

### III.

■ Plaintiffs' cause of action seeks the vindication of a major public policy of this state, which assures, as enshrined in the LAD, that

> persons shall have the opportunity to obtain employment ... without discrimination because of race, creed, color, national origin, ancestry, age, marital status, affectional or sexual orientation, familial status, disability, nationality, sex, gender identity or expression ..., subject only to conditions and limitations applicable alike to all persons. This opportunity is recognized as and declared to be a civil right.
>
> [*N.J.S.A.* 10:5–4.]

The Legislature committed firmly to its purpose, declaring plainly the state's public interest in eliminating practices of discrimination:

> [P]ractices of discrimination against any of its inhabitants, because of race, creed, color, national origin, ancestry, age, sex, affectional or sexual orientation, marital status, familial status, liability for [military] service ..., or nationality, are matters *of concern to the government of the State, and ... such discrimination threatens not only the rights and proper privileges of the inhabitants of the State but menaces the institutions and foundation of a free democratic State[.]*
>
> [*N.J.S.A.* 10:5–3.]

Without doubt, the LAD "unequivocally expresses a legislative intent to prohibit discrimination in all aspects of the employment relationship, including hiring and firing, compensation, the terms

and conditions of employment, and retirement." *Nini v. Mercer County Cmty. Coll.,* 202 *N.J.* 98, 106–07, 995 *A.*2d 1094 (2010). Those commands provide the force underlying the frequent case law refrain that "the clear public policy of this State is to eradicate invidious discrimination from the workplace." *Craig v. Suburban Cablevision, Inc.,* 140 *N.J.* 623, 630, 660 *A.*2d 505 (1995) (citing *Fuchilla v. Layman,* 109 *N.J.* 319, 334–35, 537 *A.*2d 652, *cert. denied,* 488 *U.S.* 826, 109 *S.Ct.* 75, 102 *L.Ed.*2d 51 (1988)).

█ It is equally well settled that LAD claims are subject to the two-year statute of limitations contained in *N.J.S.A.* 2A:14–2(a) ("Every action at law for an injury to the person caused by the wrongful act, neglect or default of any person within this State shall be commenced within two years next after the cause of any such action shall have accrued[.]"). *See Montells v. Haynes,* 133 *N.J.* 282, 292, 627 *A.*2d 654 (1993) (concluding two-year statute of limitations applies to LAD claims). Determining when the limitation period begins to run depends on when the cause of action accrued, which in turn is affected by the type of conduct a plaintiff alleges to have violated the LAD.

█ Generally stated, discrete acts of discrimination, such as termination or a punitive retaliatory act, are usually readily known when they occur and thus easily identified in respect of timing. Hence, their treatment for timeliness purposes is straightforward: "A discrete retaliatory or discriminatory act occurs on the day that it happens." *Roa v. Roa,* 200 *N.J.* 555, 567, 985 *A.*2d 1225 (2010) (citation, internal quotation marks, and editing marks omitted). Discriminatory termination and other similar abrupt, singular adverse employment actions that are attributable to invidious discrimination, prohibited by the LAD, generally are immediately known injuries, whose two-year statute of limitations period commences on the day they occur. *Id.* at 569, 985 *A.*2d 1225.[3]

---

[3] That is not to preclude application of the discovery rule, where discriminatory animus is concealed and therefore the LAD-violation aspect to the injury may not be discoverable until a later time. *See Roa, supra,* 200 *N.J.* at 570–71, 985

■ However, when the complained-of conduct constitutes "a series of separate acts that collectively constitute one unlawful employment practice[,]" the entire claim may be timely if filed within two years of "the date on which the last component act occurred." *Id.* at 567, 985 *A.2d* 1225 (citation and internal quotation marks omitted). The "continuing violation" doctrine, recognized under federal Title VII law as an appropriate equitable exception to the strict application of a statute of limitations, provided the analytic framework that has been used in the assessment of a LAD hostile workplace environment claim. *See id.* at 566–68, 985 *A.2d* 1225.

This Court's decision in *Shepherd v. Hunterdon Developmental Center*, 174 *N.J.* 1, 803 *A.2d* 611 (2002), specifically adopted the federal continuing violation equitable doctrine to determine the accrual date of a cause of action in a hostile workplace course-of-conduct claim. *Id.* at 18–19, 803 *A.2d* 611 (embracing analysis advanced in *Nat'l R.R. Passenger Corp. v. Morgan*, 536 *U.S.* 101, 122 *S.Ct.* 2061, 153 *L.Ed.*2d 106 (2002)). We turned to the equitable doctrine for assistance in addressing the thorny factual circumstances of an ongoing workplace harassment claim that involved alleged incidents of both discrete and non-discrete acts of discriminatory workplace hostility. *Shepherd, supra,* 174 *N.J.* at 21, 803 *A.2d* 611 (citing *Morgan, supra,* 536 *U.S.* at 116, 122 *S.Ct.* at 2074, 153 *L.Ed.*2d at 124). *Morgan* had clarified the distinction between discrete acts of discrimination and hostile work environment claims, stating that hostile work environment claims by "[t]heir very nature involve[ ] repeated conduct" of varying types and that "[s]uch claims are based on the cumulative effect of individual acts." *Morgan, supra,* 536 *U.S.* at 115, 122 *S.Ct.* at 2073–74, 153 *L.Ed.*2d at 123. Recognizing the beneficial effect of adopting *Morgan*'s approach to such difficult hostile work environment scenarios where an employee may be subjected to ongoing indignities, we held in *Shepherd, supra,* that "a victim's knowledge

---

*A.2d* 1225 *(recognizing applicability of equitable tolling principles for LAD actions).*

of a claim is insufficient to start the limitations clock so long as the defendant continues the series of non-discrete acts on which the claim as a whole is based." 174 *N.J.* at 22, 803 *A.*2d 611. Stated differently, knowledge of hostility and of ongoing acts consistent with that hostility in such a setting is insufficient to trigger the limitation timeframe within which a LAD cause of action must be filed.

*Roa* further clarified the point, explaining that "the continuing violation theory was developed to allow for the aggregation of acts, each of which, in itself, might not have alerted the employee of the existence of a claim, but which together show a pattern of discrimination." *Roa, supra,* 200 *N.J.* at 569, 985 *A.*2d 1225. However, we warned that "[w]hat the doctrine does not permit is the aggregation of discrete discriminatory acts for the purposes of reviving an untimely act of discrimination that the victim knew or should have known was actionable." *Ibid.*

With that backdrop in mind, we turn to the question of the timeliness of plaintiffs' claim.

### IV.

#### A.

Plaintiffs seek to have the continuing violation equitable doctrine, which is used in hostile workplace and similar discrimination-claim settings, sweep in as timely the entirety of the period during which they claim they were paid discriminatory wages. Specifically, they argue that the most current periods of discriminatory pay (i.e., the allegedly discriminatory disparate wages paid within two years of the filing of the complaint) should have the effect of sweeping in, and including as timely, all prior periods of discriminatory disparate pay (dating back to their dates of initial hire, which for one occurred in 1976), as may occur in hostile work environment claims.

That approach to assessment of the timeliness of a wage discrimination claim was rebuffed in respect of Title VII wage claims

by the holding in *Ledbetter*, which "reject[ed] the suggestion that an employment practice committed with no improper purpose and no discriminatory intent is rendered unlawful nonetheless because it gives some effect to an intentional discriminatory act that occurred outside the charging period." *Ledbetter, supra*, 550 *U.S.* at 632, 127 *S.Ct.* at 2172, 167 *L.Ed.*2d at 995.

*Ledbetter* was not unanimous, however. In the dissent's view, "both the pay-setting decision and the actual payment of a discriminatory wage [should be] unlawful practices" such that "each payment of a wage or salary infected by sex-based discrimination constitutes an unlawful employment practice[.]" *Id.* at 646, 127 *S.Ct.* at 2179, 167 *L.Ed.*2d at 1003 (Ginsburg, J., dissenting). The dissent agreed that "prior [pay-setting] decisions, outside the 180–day charge-filing period, are not themselves actionable," but asserted that "they are relevant in determining the unlawfulness of conduct within the period." *Ibid.* The dissent's approach hinged, in part, on its view that "discrimination with respect to compensation ... does not fit within the category of singular discrete acts 'easy to identify.'" *Id.* at 649, 127 *S.Ct.* at 2181, 167 *L.Ed.*2d at 1006. Moreover, the dissent acknowledged that an employer disadvantaged by such a delay could raise, in addition to a statute of limitations defense that cuts off all claims that predate the limitation period prior to the complaint's filing, equitable doctrines such as laches, which could address any harsh incongruous results of its approach. *Id.* at 657, 127 *S.Ct.* at 2186, 167 *L.Ed.*2d at 1010.

It is noteworthy that the majority holding in *Ledbetter* no longer reflects federal policy. In response to the decision, Congress adopted the Lilly Ledbetter Fair Pay Act of 2009 (FPA), amending Title VII. The FPA clarifies that an unlawful act occurs "each time wages, benefits, or other compensation [are] paid" resulting from an earlier discriminatory practice. 42 *U.S.C.A.* § 2000e–5(e)(3)(A). Further, the FPA allows for

recovery of back pay for *up to two years preceding the filing of the charge*, where the unlawful employment practices that have occurred during the charge filing

period are similar or related to the unlawful employment practices with regard to discrimination in compensation that occurred outside the time for filing a charge.

[42 *U.S.C.A.* § 2000e–5(e)(3)(B) (emphasis added).]

Thus, although the FPA changed *Ledbetter*'s ruling, the modification was not as drastic as the present plaintiffs would have the law be. Under the FPA, although each new payment of discriminatory wages constitutes a separate act in respect of the cause of action, the effect of the two-year statute of limitations remains: the limitations period will allow for the inclusion of only the periods of unequal wages that occurred within two years of the filing of the discrimination charge. Thus, regardless of the length of time a plaintiff has been subjected to discriminatory pay, the back-pay recovery for a claim based solely on wage discrimination will be limited to a cut-off date of two years before the filing of the discrimination charge.

The courts below succumbed to the draw of aligning our LAD jurisprudence to that which was developing under federal case law for wage discrimination claims. We do not see the allure of that congruity, not in respect of the case as it presents itself now, or as it stood prior to the time Congress altered the federal landscape.

## B.

Our state law jurisprudence has a developed approach to discriminatory wage claims. Prior decisions had treated the payment of discriminatory wages as the dissent in *Ledbetter* would have held: wage disparity based on invidious, proscribed discrimination is a violation of the LAD for which a remedy is available so long as the discriminatory wage continues. *See Decker v. Bd. of Educ. of Elizabeth,* 153 *N.J.Super.* 470, 380 *A.*2d 285 (App.Div. 1977), *certif. denied,* 75 *N.J.* 612, 384 *A.*2d 842 (1978) (treating each pay period as unlawful act under LAD); *see also Terry v. Mercer County Bd. of Chosen Freeholders,* 173 *N.J.Super.* 249, 253, 414 *A.*2d 30 (App.Div.1980) (same), *mod. on other grounds,* 86 *N.J.* 141, 430 *A.*2d 194 (1981).

In *Decker*, the Appellate Division reviewed the claim of a female cook, who alleged wage discrimination under the LAD based on the disparity between her salary and that of a male employee performing the same function. *Decker, supra,* 153 *N.J.Super.* at 472, 380 *A.*2d 285. In affirming the judgment in favor of plaintiff, the panel asserted that each pay period constituted a new violation of the LAD in the wage discrimination setting. *Id.* at 473–74, 380 *A.*2d 285. The Appellate Division reasserted this principle in *Terry, supra,* 173 *N.J.Super.* at 253, 414 *A.*2d 30. In *Terry,* plaintiffs were female supervisors who claimed that they were paid less than their male counterparts, in violation of the LAD. *Id.* at 251–52, 414 *A.*2d 30. Again, the Appellate Division determined that the payment of unequal wages is an unlawful employment practice under the LAD and remains so as long as disparate payment persists. *Id.* at 253, 414 *A.*2d 30.

Consistent with the LAD's strong promise to eliminate discrimination from the workplace, the *Decker* and *Terry* decisions reflect the public policy of this state to treat each issuance of a pay check that reflects discriminatory treatment toward a protected group as an actionable wrong under the LAD. Accordingly, we reject the alternative approach taken by the *Ledbetter* majority, despite the principled arguments of defendant and reasoning by the lower courts. That said, we also reject plaintiffs' attempt to convert the references to the continuing nature of the wrongs in *Decker* and *Terry* into something more binding in respect of modern limitations-tolling jurisprudence, specifically the "continuing violation" doctrine.

The *Decker* and *Terry* decisions were issued prior to the modern case law that has established the applicability of a two-year limitations period and, further, has drilled down on the time of accrual of a LAD cause of action, adopting, for that purpose, a nomenclature differentiating a "discrete act" from a "continuing violation." The appellate panels that considered those early LAD cases could not have appreciated the later legal significance that plaintiffs now ascribe to them because the violations under consid-

eration were described as "continuing" ones. *See, e.g., Decker, supra,* 153 *N.J.Super.* at 473–74, 380 *A.*2d 285 (stating that "the act of discrimination was a continuing one" and that each "pay period constituted a new or another violation"); *Terry, supra,* 173 *N.J.Super.* at 253, 414 *A.*2d 30 (referring to "[t]he payment of unequal wages" as "continuing violations for the purposes of determining whether a claim is barred"). Viewed with the benefit of hindsight, and informed by modern LAD-accrual jurisprudence, this state's prior case law reflects that each discriminatory pay check has been treated as the equivalent of a "discrete" and separable violation of the LAD, so long as the wage remains tainted by the original act of discriminatory intent. To those discrete, serial, and actionable wrongs under the LAD, we apply a two-year statute of limitations. *See Montells, supra,* 133 *N.J.* at 292, 627 *A.*2d 654 (concluding that two-year statute of limitations period applies to LAD discrimination claims); *cf. Lavin v. Bd. of Educ. of Hackensack,* 90 *N.J.* 145, 160, 447 *A.*2d 516 (1982) (treating similarly wage claim by educators claiming improper application of military service credit statute, and explaining applicability of statute of limitations, as well as equitable doctrine of laches in special circumstances).

In sum, we reject the sea change that would be effected were we to adopt the *Ledbetter* majority approach to wage discrimination claims under our LAD. In light of settled prior case law that treated payment of unequal wages in violation of our anti-discrimination law as a series of actionable wrongs under the LAD, which are subject to the two-year statute of limitations, we see no persuasive reason for adopting the *Ledbetter* majority's restrictive approach to the vindication of a plaintiff's right to relief under the LAD for wage discrimination. Although we have turned for guidance to federal Title VII law when navigating new, uncharted paths as novel LAD issues have arisen, *see, e.g., Carmona v. Resorts Int'l Hotel, Inc.,* 189 *N.J.* 354, 370, 915 *A.*2d 518 (2007) (stating, "we have frequently looked to case law under Title VII ... for guidance in developing standards to govern the resolution of LAD claims" (citation omitted)); *Lehmann v. Toys 'R' Us, Inc.,*

132 *N.J.* 587, 600, 626 *A.*2d 445 (1993) (calling federal Title VII precedent "a key source of interpretive authority" when construing LAD (citation omitted)); in the present matter, federal guidance is not necessary to settle any complicated legal issue under our LAD.

Under this state's prior precedent, the statutory violation for which plaintiffs seek vindication is not untimely in respect of the allegedly discriminatory wages that have been paid to them as recently as during the two years that immediately preceded the filing of their complaint. That no affirmative act, beyond continued payment of allegedly discriminatory disparate wages, occurred during that two-year period does not bar plaintiffs' right to seek fulfillment of the LAD's promise of a discrimination-free workplace, and its specific prohibition against payment of wages on a discriminatory basis. *See N.J.S.A.* 10:5–12 (making it an unlawful employment practice to "discriminate against [protected employee] in *compensation* or in terms, conditions or privileges of employment" (emphasis added)); *Nini, supra,* 202 *N.J.* at 106–07, 995 *A.*2d 1094. Finally, we add that any attraction attributable to neatly aligning our jurisprudence with case law developing for Title VII is undermined by the congressional reaction repudiating the *Ledbetter* decision. It would be an odd step to bring this state's jurisprudence into conformity with case law that has been rendered obsolete.

We hold that the payment of wages on a discriminatory basis proscribed by the LAD is, and remains, an actionable violation of our state's anti-discrimination law as long as the wage remains tainted by the original discriminatory action. Each payment of such discriminatory wages thus constitutes a renewed separable and actionable wrong that is remediable under the LAD. The two-year statute of limitations applies to such violations, cutting off the untimely portion and, as a result, operating as a limit on the back period for which a plaintiff may seek recovery under the LAD. We further hold that plaintiffs' complaint was timely in respect of the allegedly discriminatory wages paid during the two years immedi-

ately prior to the filing of their complaint.[4] We therefore reverse and remand for reinstatement of plaintiffs' timely claims of wage discrimination.

## VI.

The judgment of the Appellate Division is reversed and the matter is remanded for further proceedings consistent with this opinion.

Justice RIVERA–SOTO, concurring in part and dissenting in part.

I concur with the following three conclusions of law reached by the majority: that "the payment of wages on a discriminatory basis proscribed by the LAD is, and remains, an actionable violation of our state's anti-discrimination law as long as the wage remains tainted by the original discriminatory action[,]" *ante* at 235, 8 *A*.3d at 207; that "[e]ach payment of such discriminatory wages thus constitutes a renewed separable and actionable wrong that is remediable under the LAD[,]" *ante* at 235, 8 *A*.3d at 207; and that "[t]he two-year statute of limitations applies to such violations, cutting off the untimely portion and, as a result, operating as a limit on the back period for which a plaintiff may seek recovery under the LAD[,]" *ante* at 235, 8 *A*.3d at 207. All things being equal, those conclusions seemingly should lead to the majority's final conclusion: that "plaintiffs' complaint was timely in respect of the allegedly discriminatory wages paid during the two years immediately prior to the filing of their complaint[,]" and that, to that extent, plaintiffs' complaint should be reinstated.

---

[4] To the extent plaintiffs dismissed without prejudice their unequal pay claims for the two-year period immediately prior to the filing of the complaint, their action was influenced by the lower courts' misconceived insistence on a showing, within that period, of fresh discriminatory pay actions along the lines of the discrete act of the original discriminatory pay-setting decision. In view of our holding, we conclude that plaintiffs should be permitted to reinstate the timely claims that survive the cut-off of the two-year statute of limitations.

*Ante* at 235–36, 8 *A*.3d at 207. However, all things are *not* equal; the unique facts of this case and the volitional and intentional choices made by plaintiffs command a far different outcome. As a result, I must part company with the majority in respect of its final conclusion.

As the factual summary described by the majority makes clear, on July 27, 2007, three plaintiffs filed a complaint against defendants alleging that each plaintiff had been the subject of discrimination in respect of their pay dating from their original dates of employment; they sought damages that stretched back 29, 25 and 20 years, respectively. Ruling on defendants' motion to dismiss that asserted that plaintiffs' complaint was barred by the statute of limitations, the trial court determined that plaintiffs' damages claims based on pay decisions or their impact older than two years before the filing of their lawsuit indeed were barred by the statute of limitations. Plaintiffs sought reconsideration, which was denied. Plaintiffs then knowingly and intentionally made a strategic and dispositive decision: adopting an "all-or-nothing" stance, plaintiffs moved before the trial court for a ruling that the continuing violations doctrine applied to their discrimination claims and, hence, they were entitled to wage differential damages well past the two-year statute of limitations period, instead going back between two and three decades. That application, too, was rejected.

Abandoning all other avenues of attack before both the Appellate Division and this Court, plaintiffs doggedly have clung to the position—exclusive of all others—that their decades-old discrimination claims remained alive under the continuing violations doctrine. And, despite repeated attempts by this Court during argument to inject some moderation into plaintiffs' "all-or-nothing" gamble, plaintiffs steadfastly have rejected the remedy the majority today gratuitously awards: the recovery of provable discriminatory pay differential arising during the limitations period immediately preceding the filing of the complaint.

It is important to underscore that the majority has rejected soundly plaintiffs' gambit to extend the continuing violations doctrine to this setting, a rejection in which I concur. Thus, having rejected plaintiffs' sole and intentionally exclusive ground for appeal, the poignant question remains unanswered: *why* are plaintiffs entitled to any relief at all?

As a practical matter, the decision reached by the majority reinstates the initial determination made by the trial court in response to defendants' motion to dismiss. That relief, however, categorically was rejected by plaintiffs. Despite the lukewarm explanation the majority crafts to justify its indulgence towards plaintiffs—that plaintiffs somehow were "influenced by the lower courts' misconceived insistence on a showing ... of [timely] fresh discriminatory pay actions" and, thus, "should be permitted to reinstate the timely claims that survive the cut-off of the two-year statute of limitations[,]" *ante* at 236 n. 4, 8 *A*.3d at 207 n. 4, a claim plaintiffs pointedly *never* advanced—there is no proper jurisprudential reason to rescue plaintiffs from the consequences of their considered actions.

Having made their election with the advice of competent counsel, there can be no legal or equitable justification to relieve plaintiffs of the direct and proximate results of that election. The better reasoned outcome in this case is to adopt the majority's reasoning in respect of the timeliness of plaintiffs' claims—thereby modifying the rationale of the Appellate Division—but nevertheless affirm the judgment dismissing plaintiffs' complaint. Because the majority wrongfully and without proper warrant extends an unprecedented level of largesse to plaintiff—at the sole expense, to be sure, of defendants who have been denied basic due process by way of notice and an opportunity to be heard in respect of the result this Court unilaterally has conjured up—I dissent.

*For reversal and remandment*—Chief Justice RABNER, LONG, LaVECCHIA, ALBIN and HOENS—5.

*For concurrence in part;   dissent in part*—Justice RIVERA–SOTO—1.

*Not Participating*—Justice STERN.